**VENABLE LLP**
Jean-Paul P. Cart (SBN 267516)
jpcart@venable.com
Antonia I. Stabile (SBN 329559)
astabile@venable.com
Harry Libarle (SBN 346020)
hlibarle@venable.com
101 California Street, Suite 3800
San Francisco, CA 94111
Telephone: 415.653.3750
Facsimile: 415.653.3755

Attorneys for Defendant,
InMarket Media, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE INMARKET MEDIA LOCATION DATA TRACKING LITIGATION | Case No. 3:24-cv-00511-JSC<br><br>Hon. Jacqueline Scott Corley<br><br>**INMARKET MEDIA, LLC'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>[Concurrently filed Request for Judicial Notice and Declaration of Jean-Paul P. Cart]<br><br>Date: April 3, 2025<br>Time: 10:00 a.m.<br>Dept: 8, 19th Floor |



VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

**TABLE OF CONTENTS**

I. INTRODUCTION. .......... 3

II. STATEMENT OF THE CASE. .......... 4

A. PLAINTIFFS' ALLEGATIONS REGARDING INMARKET'S BUSINESS AND TECHNOLOGY .......... 4

B. PLAINTIFFS' ALLEGATIONS REGARDING THEIR INVOLVEMENT WITH INMARKET. .......... 7

C. PLAINTIFFS' CLAIMS AND DEMANDS FOR RELIEF. .......... 9

III. ARGUMENT. .......... 11

A. PLAINTIFFS' INVASION OF PRIVACY CLAIM FAILS AS A MATTER OF LAW. .......... 13

B. PLAINTIFFS' CDAFA CLAIM FAILS AS A MATTER OF LAW. .......... 17

C. PLAINTIFFS' CAL. PENAL CODE § 638.51 CLAIM FAILS AS A MATTER OF LAW. .......... 19

D. PLAINTIFFS' CAL. PENAL CODE § 631 CLAIM FAILS AS A MATTER OF LAW. .......... 20

E. PLAINTIFFS' UCL CLAIMS FAIL AS A MATTER OF LAW. .......... 23

1. PLAINTIFFS' UCL CLAIMS FAIL FOR LACK OF STANDING. .......... 23

2. PLAINTIFFS HAVE FAILED TO PLEAD ANY ACTIONABLE UNLAWFUL OR UNFAIR CONDUCT BY INMARKET. .......... 24

F. PLAINTIFFS' UNJUST ENRICHMENT CLAIM FAILS AS A MATTER OF LAW. .......... 25

IV. CONCLUSION. .......... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adams v. Johnson*,
355 F.3d 1179 (9th Cir. 2004) ....................12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................12

*Baiul-Farina v. Lemire*,
804 F. App'x 533 (9th Cir. 2020) ....................25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................12

*Belluomni v. Citigroup, Inc.*,
No. CV 13-01743 CRB, 2013 WL 3855589 (N.D. Cal. July 24, 2013)....................13

*Blue Wing Airlines Fin. v. Unical Aviation, Inc.*,
No. 8:22-cv-02052 JVS, 2023 WL 3149276 (C.D. Cal. Mar. 8, 2023)....................26

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) ....................22

*In re Carrier IQ, Inc., Consumer Privacy Litig.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) ....................17

*Cottle v. Plaid Inc.*,
536 F. Supp. 3d 461 (N.D. Cal. 2021) ....................18

*D'Angelo v. FCA US, LLC*,
No. 3:23-cv-00982-WQH-MMP, 2024 U.S. Dist. LEXIS 70298 (S.D. Cal. Mar. 28, 2024)....................14

*Davis v. Facebook, Inc. (In re Facebook Inc. Internet Tracking Litig.)*,
956 F.3d 589 (9th Cir. 2020) ....................13, 16

*Doe v. Meta Platforms, Inc.*,
No. 22-cv-03580-WHO, 2023 WL 5837443 (N.D. Cal. Sept. 7, 2023)....................18

*Eidmann v. Walgreen Co.*,
522 F. Supp. 3d 634 (N.D. Cal. 2021) ....................25

*Esparza v. Kohl's*,
No. 23-cv-01988-AJB-KSC, 2024 U.S. Dist. LEXIS 47564 (S.D. Cal. Mar. 18, 2024) ....................14

*Fayer v. Vaughn*,
649 F.3d 1061 (9th Cir. 2011) ....................12

*Flextronics Int'l, Ltd. v. Parametric Tech. Corp.*,
No. 5:13-cv-00034-PSG, 2014 U.S. Dist. LEXIS 73354 (N.D. Cal. May 28, 2014) ....................18

*Gonzales v. Uber Techs., Inc.*,
305 F. Supp. 3d 1078 (N.D. Cal. 2018) ....................22

*In re Google Android Consumer Priv. Litig.*,
No. 11-MD-02264 JSW, 2013 WL 1283236 (N.D. Cal. Mar. 26, 2013) ....................17

*In re Google Assistant Privacy Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ....................21

*In re Google Location History Litig.*,
428 F. Supp. 3d at 198 ....................13, 14, 15, 16

*Graf v. Zynga Game Network, Inc. (In re Zynga Privacy Litig.)*,
750 F.3d 1098 (9th Cir. 2014) ....................14

*Hadley v. Kellogg Sales Co.*,
243 F. Supp. 3d 1074 (N.D. Cal. 2017) ....................25

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ....................15

*Hurrey-Mayer v. Wells Fargo Home Mortg., Inc.*,
No. 09cv1470 DMS (NLS), 2009 WL 3647632 (S.D. Cal. Nov. 4, 2009) ....................13

*In re iPhone Application Litig.*,
844 F. Supp. 2d at 1063 ....................14, 16, 22

*In re iPhone Application Litig.*,
No. 11-MD-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sep. 20, 2011) ....................14, 18

*Ji v. Naver Corp.*,
No. 21-cv-05143-HSG, 2022 WL 4624898 (N.D. Cal. Sept. 30, 2022) ....................24

*Low v. LinkedIn Corp.*,
900 F. Supp. 2d 1010 (N.D. Cal. 2012) ....................14, 16

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) ....................12

*Mastel v. Miniclip SA*,
549 F. Supp. 3d 1129 (E.D. Cal. 2021) ....................21

*Matera v. Google Inc.*,
No. 15-CV-04062-LHK, 2016 WL 8200619 (N.D. Cal. Aug. 12, 2016)................................21

*Mirmalek v. L.A. Times*,
2024 U.S. Dist. LEXIS 227378 (N.D. Cal. Dec. 12, 2024)....................................................20

*Pratt v. Higgins*,
No. 22-cv-04228-HSG, 2023 WL 4564551 (N.D. Cal. July 17, 2023)..................................18

*Quick Dispense, Inc. v. Vitality Foodservice, Inc.*,
No. 8:23-cv-02322-FWS-ADS, 2024 WL 2925589 (C.D. Cal. June 4, 2024)........................25

*Rodriguez v. Google LLC*,
No. 20-cv-04688-RS, 2021 WL 2026726 (N.D. Cal. May 21, 2021)....................................24

*In re Sequoia Bens.*,
No. 22-cv-08217-RFL, 2024 WL 1091195 (N.D. Cal. Feb. 22, 2024)..................................25

*Shah v. Fandom, Inc.*,
2024 U.S. Dist. LEXIS 193032 (N.D. Cal. Oct. 21, 2024).....................................................20

*Smith v. Maryland*,
442 U.S. 735 (1979)...............................................................................................................20

*Swarts v. Home Depot, Inc.*,
No. 23-cv-0995-JST, 2023 U.S. Dist. LEXIS 153477 (N.D. Cal. Aug. 30, 2023)..............................................................................................................................24

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017)..................................................................................15

*Weisbuch v. Cnty of L.A.*,
119 F.3d 778 (9th Cir. 1997)...................................................................................................12

**California Cases**

*Hill v. Nat'l Collegiate Athletic Ass'n*,
7 Cal. 4th 1 (1994)...................................................................................................................13

*Ingels v. Westwood One Broad. Servs., Inc.*,
129 Cal. App. 4th 1050 (2005)................................................................................................25

*Jogani v. Super. Court*,
165 Cal. App. 4th 901 (2008)..................................................................................................25

*Kwikset Corp. v. Superior Court*,
51 Cal. 4th 310 (2011).............................................................................................................24

*Miller v. Nat'l Broad. Co.*,
187 Cal. App. 3d 1463 (1986)..................................................................................................15

*Tavernetti v. Superior Court of San Diego Cty.*,
22 Cal. 3d 187 (1978) ....................20

**Constitutions**

California Constitution....................9, 13

United States Constitution 4th Amendment ....................9

**Federal Statutes**

Federal Trade Commission Act ....................11, 23, 25

Federal Wiretap Act....................22

**California Statutes**

Cal. Bus. & Prof. Code
§ 17200....................12
§ 17204....................23

Cal. Pen. Code
§ 502....................12
§ 502(c)(1) ....................17
§ 502(c)(2) ....................17
§ 502(c)(7) ....................17
§ 502(e)(1) ....................17
§ 631.................... *passim*
§ 631(a) .................... *passim*
§ 636.51....................12
§ 638.51....................1, 10, 19, 20

California Comprehensive Data Access and Fraud Act ....................1, 3

**Court Rules**

Federal Rule of Civil Procedure 12(b)(6) ....................11, 12

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**

PLEASE TAKE NOTICE that on April 3, 2025, at 10:00 a.m., or as soon as this matter may be heard, in the courtroom of the Honorable Jacqueline Scott Corley, located in Courtroom 8, 19th Floor, of the United States District Courthouse, 450 Golden Gate Avenue, San Francisco, California, 94102, Defendant InMarket Media, LLC ("InMarket") will and hereby does move this Court for a motion to dismiss all claims pleaded against it. The basis for the requested relief is as follows:

Plaintiffs Autry Willis and Kenneth Kruger's ("Plaintiffs") Second Consolidated Amended Class Action Complaint (the "Amended Complaint") fails to state a claim as a matter of law. Plaintiffs' invasion of privacy claim fails because they have failed to plead facts sufficient to reflect a legally protected privacy interest and a reasonable expectation of privacy, nor that InMarket invaded any such interest in a prohibited manner. Their California Comprehensive Data Access and Fraud Act claim likewise fails, because they have failed to allege a compensable harm, nor that InMarket knowingly obtained any covered data or information without consent. Plaintiffs' "pen register" claim under Cal. Pen. Code § 638.51 fails as a matter of law because their non-conclusory allegations fail to identify the existence of a "pen register" maintained or implemented by InMarket, or InMarket's receipt of information covered by this statute. Plaintiffs' "interception" theory under Cal. Pen. Code § 631 fails for a range of reasons, as certain prongs of this statute are limited to landline telephones, and the others are not applicable here because Plaintiffs did not send or make any communications, nor did InMarket receive or intercept any California Invasion of Privacy Act-covered communications made by Plaintiffs. Plaintiffs' Unfair Competition Law ("UCL") claims fail as a matter of law because they have failed to allege facts reflecting statutory standing under the UCL, and because their other legal claims fail. And finally, Plaintiffs' claim for "unjust enrichment" fails because that is not a cause of action under California law.

This Motion is based on this Notice of Motion, the following Memorandum of Points and Authorities, the pleadings, and other documents on file in this case, and all other arguments, evidence, and submissions as may be presented at oral argument of counsel.

Dated: January 20, 2025

VENABLE LLP

By: */s/ Jean-Paul P. Cart*
Jean-Paul P. Cart

Attorneys for Defendant,
InMarket Media, LLC

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION.

Plaintiffs Autry Willis and Kenneth Kruger ("Plaintiffs") do not have claims. This Court granted them the opportunity to amend their prior pleadings to seek to cure the deficiency that they failed allege which mobile phone applications this case is actually about. In their Second Consolidated Amended Class Action Complaint (the "SCAC" or "Second Amended Complaint"), Plaintiffs list four applications, tepidly, declining to truly commit to the allegation that the applications contain Defendant InMarket Media, LLC's ("InMarket") software development kit ("SDK") or provide geolocation information to InMarket. None of these applications contain, or at any time has contained, the InMarket SDK. And as the SCAC incorporates the specific articles and press releases that purportedly back Plaintiffs' "information and belief" allegations, they can be considered, and provide no basis whatsoever for Plaintiffs' contentions that these applications contain an InMarket SDK. (*See* Request for Judicial Notice.)

Additionally, Plaintiffs do not allege that InMarket directed any conduct, activities, products, or services to them, specifically. Rather, they claim that they downloaded third-party applications that sent geolocation data to InMarket while they were using these applications—and while they knew such applications tracked geolocation information, because they permitted these applications to do so. They do not they allege where they used the third-party applications, what privacy and data collection/use disclosures they received, that they actually reviewed any privacy disclosures or the location sharing settings they selected—unjustifiable omissions given that third-party applications have privacy policies and disclosures, mobile application stores mandate certain disclosures, mobile phone operating systems require data collection notices and permissions before collection is technically possible, and consumers generally have a choice as to what to permit each application on their mobile phones to track and share.

Plaintiffs seek to represent a purported class of "[a]ll persons who reside in California whose data, including but not limited to their geolocation data, was collected by Defendant without their consent." (SCAC ¶ 141.) They attempt to plead a wide range of often contradictory claims: invasion of privacy, violation of the California Comprehensive Data Access and Fraud

Act ("CDAFA"), installation of a pen register, wiretapping, violation of the unlawful and unfair prongs of the Unfair Competition Law ("UCL"), and unjust enrichment. Each of these claims fails as a matter of law.

Plaintiffs fundamentally allege that InMarket received a narrow type of data (geolocation), during the windows in which Plaintiffs used certain mobile applications—which they knew could collect geolocation information because Plaintiffs authorized it—and then used that data in connection with Plaintiffs' use of these same applications. Plaintiffs' allegations that the applications they downloaded contain InMarket SDK code (or provide InMarket with data) are false, and recklessly so, based only on an intentional misreading of public information. Regardless, California law does not provide a cause of action for invasion of privacy under such circumstances. Nor does the CDAFA criminalize such conduct or permit Plaintiffs to pursue a civil recovery when they were not harmed in any way and never even allege that they reviewed any of the privacy disclosures that were made to them (much less what those disclosures said). Plaintiffs' pen register and wiretapping claims likewise miss the mark, as these statutes are incompatible with—and were never intended to address—the alleged receipt of entirely non-communicative geolocation coordinates transmitted automatically by Plaintiffs mobile phones. As these claims fail, so do Plaintiffs' UCL claims, which require both a showing of harm and a predicate violation of the law. And lastly, unjust enrichment is not a cause of action.

Accordingly, and for the reasons explained herein, the Second Amended Consolidated Complaint and each claim asserted therein should be dismissed.

## II. STATEMENT OF THE CASE.

### A. Plaintiffs' Allegations Regarding InMarket's Business and Technology.

InMarket contends that Plaintiffs have failed to accurately describe InMarket's past and present business practices and technologies and that Plaintiffs' operative complaint contains a range of misleading and contradictory factual allegations. This being a motion to dismiss, however, suffice it to say that Plaintiffs' core allegation is that InMarket collects geolocation data regarding certain consumers and then uses that data for targeted advertising purposes, exceeding consumer consent in doing so. Plaintiffs allege that InMarket uses two distinct

mechanisms to collect geolocation data regarding consumers, although for the reasons discussed below, only one of these alleged mechanisms is relevant to Plaintiffs' claims.

First, Plaintiffs allege that InMarket collects geolocation data regarding consumers through first-party mobile phone applications developed and owned by InMarket. While discussed here for context, neither Plaintiff alleges they ever downloaded such an application. Plaintiffs contend that InMarket has incorporated the InMarket SDK into certain mobile applications that it allegedly owns and operates, including "free to download" applications such as "CheckPoints, which offers shopping rewards for completing tasks such as watching videos and taking online quizzes, and ListEase, which helps consumers create shopping lists." (SCAC ¶¶ 95-96.) According to Plaintiffs, CheckPoints is advertised as a "rewards app" through which consumers can "collect points by performing various tasks (checking into retail locations, watching videos, scanning certain products while in store, taking surveys and quizzes)" and then exchange their points for rewards such as gift cards, while ListEase is an "electronic shopping list app." (*Id.* at ¶¶ 96-97.)

Plaintiffs contend that when consumers download these InMarket owned-and-operated applications, they are greeted by a "consent screen," which states that any consumer information the applications will allegedly collect will be used for the applications' "functionality (earning points and keeping lists)." (SCAC ¶ 98.) They allege that this statement is a "half-truth" because InMarket fails to disclose that its first-party mobile phone applications are also purportedly collecting "users' precise location, often multiple times per hour, along with data collected from multiple other sources []." (*Id.* at ¶ 99.) Plaintiffs fail to allege or explain *how* Checkpoints, ListEase, or any of the several other applications Plaintiffs allege InMarket acquired between 2019 and 2021 (*i.e.*, Thinknear, NinthDecimal, Key Ring, and Out of Milk) actually collect any consumer information. (*Id.* at ¶¶ 105-114.) And they do *not* allege that InMarket collected any of *their* information through these products.

Second, Plaintiffs allege that InMarket collects geolocation data regarding consumers through third-party mobile phone applications that incorporate an InMarket software development kit (i.e., the "InMarket SDK"). Plaintiffs contend that the InMarket SDK is a

"collection of development tools" that has been incorporated into more than 300 third-party applications. (SCAC ¶¶ 40, 44.) They further allege that the InMarket SDK functions as "spyware" embedded within the third-party applications, which "monitors, tracks, and identifies consumers in real time" and without the users' consent. (*Id.* at ¶¶ 42-43.) Plaintiffs also allege that the third-party applications containing InMarket's SDK collect users' "location data" and transmit "the consumer's precise location back to [InMarket]." (*Id.* at ¶ 41.) To collect users' geolocation data, these third-party applications request access to "the location data generated by a mobile device's operating system," and—through a process Plaintiffs fail to allege or explain—the InMarket SDK receives "the device's precise latitude and longitude, along with a timestamp and unique mobile device identifier," which is eventually transmitted to InMarket via a process Plaintiffs also fail to explain or allege. (*Id.* at ¶ 46.) This information is then allegedly used to "facilitate targeted advertising to consumers on their mobile devices for the company's clients, which include brands and advertising agencies." (*Id.* at ¶ 51.)

According to Plaintiffs, InMarket uses the geolocation data it allegedly receives through the third-party applications to place consumers into "almost two thousand" distinct advertising "audience segments" and offers its advertising clients access to these "audience segments." (SCAC ¶¶ 84-85.) For example, "an InMarket brand client can target shoppers who are likely to be low-income millennials; well-off suburban moms; parents of preschoolers, high-school students, or kids who are home-schooled []," among other "audience segments." (*Id.* at ¶ 85-86.) Plaintiffs further contend that consumers are placed into these "audience segments" based on their location data—that is, for example, "if a consumer's past location data shows that she has visited a car dealership, InMarket can combine that information with the consumer's attributes purchased from other sources (age, income, family structure, education level), and can potentially predict that she may be in the market for a certain type of vehicle." (*Id.* at ¶¶ 87-88.)

Finally, Plaintiffs allege that consumers' geolocation data is made available to advertisers so that they can send push notifications to individual devices "based on a consumer's location and 'geofencing,'" which Plaintiffs define as "the creation of a virtual fence around a particular point of interest." (SCAC ¶ 90.) Plaintiffs further contend that InMarket makes its advertising

"audience segments" available on real-time bidding platforms where "an advertiser using one of these platforms can select an advertising audience and identify the amount that it is willing to pay (that is, its bid) each time its ad appears on a mobile device that is a part of that audience," with the advertiser's ad appearing on a particular device "if it has the highest bid for that device." (*Id.* at ¶¶ 92-93.) Notably, however, throughout the Second Amended Complaint, Plaintiffs fail to allege that they ever communicated directly with InMarket (or even that they communicated their location to a third-party application, rather than that information being collected through an automatic process performed by their mobile device).

**B. Plaintiffs' Allegations Regarding their Involvement with InMarket.**

Plaintiff Autry Willis alleges that she is a resident of Oakland, California. (SCAC ¶ 11.) Plaintiff Kenneth Kruger alleges that he is a resident of Palo Alto, California. (*Id.* at ¶ 18.) Beyond this distinction, Plaintiffs' claims about their involvement with InMarket are nearly identical. Willis alleges that she downloaded the Pandora, CVS, and Michaels applications on her mobile phone. (*Id.* ¶ 12.) Kruger alleges that downloaded the CVS and Walmart applications on his mobile phone. (*Id.* at ¶ 18.) They both allege that while these applications were on their phones, they traveled "to various locations—including [] home, work, medical appointments, church, and other places [they] consider sensitive and private." (*Id.* at ¶¶ 13, 19.)

Neither Plaintiff alleges they ever downloaded a mobile phone application developed, owned, or distributed by InMarket—rendering their allegations regarding InMarket's first-party mobile applications irrelevant. (*See* SCAC.) Instead, both Plaintiffs allege that the applications referenced above (*i.e.* Pandora, CVS, Michaels, and Walmart) "sent location data to Defendant **<u>when Plaintiff [] used the Apps</u>**. **<u>During that entire time</u>**, the Apps tracked the geolocation of Plaintiff []." (*Id.* at ¶¶ 15, 21) (emphasis added). Plaintiffs do not expressly allege that the Pandora, CVS, Michaels, or Walmart mobile phone applications contain the InMarket SDK, and indeed, they tacitly acknowledge that they are merely hoping that they do. (*See id.* at ¶¶ 15, 21, 34.) Hope as they may, none of those applications have contained the InMarket SDK or provided any data to InMarket—Plaintiffs do not have claims. Yet at this procedural stage, it is important to note that Plaintiffs pleaded the hyperlinked documents that apparently support their

"information and belief." None of these documents give reasonable support to the allegations. (*See* Request for Judicial Notice.)

In support of their theory that the Pandora app contains the InMarket SDK, Plaintiffs cite a PR Newswire press release that discusses Pandora entering into a "preferred provider agreement" with InMarket. (SCAC ¶ 12, n.1.) The piece announces that Pandora will use InMarket ad campaign measurement products. *Id.* While the press release shows that Pandora is a customer of InMarket, it does not state that the SDK is in the Pandora app or that Pandora transmitted geolocation data to InMarket. With respect to CVS (*see* SCAC ¶ 12, n.2): (1) the ZD Net article does not reference InMarket at all with respect to CVS; (2) the MMA Global presentation discussed visit trend data regarding CVS stores, but said nothing about a CVS application incorporating the InMarket SDK; (3) the InMarket Live Campaign post merely stated that a certain product could be purchased at CVS; and (4) the Apple Store App page only stated that it could be used to store rewards card information for stores including CVS. Plaintiffs fare no better with Michaels (SCAC ¶ 12, n.3), as the cited white paper discusses visits to Michaels stores and has nothing to do with a Michaels mobile application. Nor do any of the documents Plaintiffs relied on regarding Walmart ever mention the Walmart mobile applications or so much as hint that it includes the InMarket SDK. (SCAC ¶ 18, n.4.)

Notably, Plaintiffs make no allegations regarding the disclosures or prompts they received when they downloaded the Pandora, CVS, Michaels, or Walmart mobile phone applications. Nor do they allege that they permitted these applications to access *any* geolocation data at all, much less what they were informed of or agreed to when permitting such access. Plaintiffs also do not allege that either the Pandora, CVS, Michaels, or Walmart mobile phone applications can, have, or were configured to collect geolocation data at all, or when they were not being used—either as a general matter or on Plaintiffs' phones. Indeed, they allege in paragraphs 15 and 21 that these applications at most only collected geolocation data when they were in use—yet Plaintiffs do not allege where they used these applications.[1]

[1] Plaintiffs' amendment to their pleading contains a litany of irrelevant allegations. They allege how an entirely different company, Roam.ia, purportedly conducts its business. (SCAC ¶ 56.)

### C. Plaintiffs' Claims and Demands for Relief.

Plaintiffs first allege that they have a legally protected privacy interest in—and a reasonable expectation of privacy to—their geolocation information, pursuant to the California Constitution, common law, and the 4th Amendment to the United States Constitution, and thus, Plaintiffs "could not have reasonably expected that [InMarket] would violate state privacy laws," nor were they "aware and could not have reasonably expected that unknown third party would install software on their mobile devices that would track and transmit their physical location and communications" and share their "sensitive information." (SCAC ¶¶ 153-154.) Plaintiffs further contend that InMarket's purported conduct "in secretly intercepting and collecting" their personal information violated their privacy rights and was an "egregious breach of social norms and is highly offensive to a reasonable person." (*Id.* at ¶¶ 156-157.) Ironically, however, Plaintiffs both allege that their personal information is "private" and "sensitive," but, as explained further below, they also bring claims that imply they could and would have sold that alleged "private" and "sensitive" information to others.

Plaintiffs next claim InMarket violated the CDAFA by "knowingly accessing [their] smartphones without their permission by including within the SDK that [InMarket] provides to developers, software that intercepts and transmits data, communications, and personal information concerning Plaintiffs[.]" (SCAC ¶ 165.) However, Plaintiffs conclusory allegations are insufficient, as they provide no explanation for *how* or *when* such information is allegedly transmitted from the third-party application(s) Plaintiffs supposedly downloaded and used to InMarket. Plaintiffs also state that they did not provide "informed consent," but again, fail to state what disclosures they received, what permissions they allowed on their mobile devices, or how the applications they allegedly downloaded collected information or provided it to InMarket

---

They make allegations specific to desktop computers rather than mobile devices. (*Id.* at ¶¶ 59, 60.) They allege that InMarket has dealings with TikTok without alleging that such dealings involve InMarket receiving any geolocation data from TikTok. (*Id.* at ¶¶ 64, 65.) And they make a range of allegations regarding patents that InMarket has applied for without ever alleging that such technologies have been used to collect information from them without consent, nor that they relate in any way to the InMarket SDK. (*Id.* at ¶¶ 67-72.)

(which did not happen, as the InMarket SDK is not incorporated into any of the applications named in the Second Amended Complaint), rendering implausible Plaintiffs' allegation that InMarket "intercepts and/or takes data, communications, and personal information concerning Plaintiffs" without their "informed consent." (*Id.* at ¶¶ 166-168.)

Third, Plaintiffs contend InMarket violated Cal. Penal Code § 638.51 because its SDK "constitutes a 'pen register'" as it is "a device or process that records addressing or signaling information—Plaintiffs and Class Members' location data and personal information—from the electronic communications transmitted by their smartphones." (SCAC ¶ 178.) Importantly, however, Plaintiffs do not allege what categories of "communications" are allegedly tracked or recorded by InMarket's SDK. For example, Plaintiffs do not allege that any text messages, video messages, chats or phone conversations between Plaintiffs and the third-party application(s) they supposedly downloaded were recorded or intercepted. Rather, the core of Plaintiffs' allegations against InMarket is that its SDK tracks *geolocation coordinate* data sent by the mobile device without any action taken by the Plaintiffs.

Fourth, Plaintiffs appear to be bring their CIPA claim under all three prongs of Section 631(a) because they allege, among other things, that InMarket "intercepts, reads, or attempts to read Plaintiffs' and Class members' data, communications, and personal information in California" and intercepts Plaintiffs' and Class Members' communications while they are in transit to and from Plaintiffs' and Class Members' smartphones and the apps, app developers, and cellphone towers; Defendant transmits a copy of Plaintiffs' and Class Members' communications to itself." (SCAC ¶¶ 188-189.) Plaintiffs further claim that they did not know InMarket was allegedly "intercepting and recording their communications, as such they could not and did not consent for their communications to be intercepted by Defendant and thereafter transmitted to others" and also contend that "Defendant's SDK constitutes a machine, instrument, contrivance, or other manner to track and intercept Plaintiffs' and Class members' communications while they are using their smartphones." (*Id.* ¶¶ 190-191.) But Plaintiffs fail to allege that InMarket received *any* communication made by the Plaintiffs and fail to allege that InMarket tapped any communications using telegraph or telephone wires, which is necessary to

plausibly allege a claim under prong one of section 631(a). Moreover, Plaintiffs fail to allege that InMarket accessed any communications while they were "in transit" to plausibly allege a claim under prong two, and thus any claim under prong three necessarily fails, as Plaintiffs' claim under prong three is dependent on a prong one or prong two violation.

Fifth, Plaintiffs allege that InMarket violated the "unfair" prong of the UCL by "surreptitiously collecting, tracking, using and disseminating Plaintiffs' and Class Members' personal information, geolocation data, and communications." (SCAC ¶ 209.) As to their Sixth claim, Plaintiffs allege that InMarket violated the "unlawful" prong of the UCL by violating the other causes of action discussed above, and by way of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. (*Id.* at ¶¶ 209, 218.) Yet, Plaintiffs' UCL claims are nonsensical because they fail to allege that they paid any money for the third-party applications they supposedly downloaded, and therefore they cannot plausibly contend that they overpaid for or would not have purchased any goods or services had they known that the applications contained an InMarket SDK or been aware of InMarket's alleged activities.

Finally, Plaintiffs' unjust enrichment claim is premised on their allegation that Plaintiffs "conferred a benefit on [InMarket] through the use and dissemination of Plaintiffs' and Class Members' personal information, geolocation data, and communications" and that "it is unjust under the circumstances for [InMarket] to retain the benefit conferred by Plaintiffs and Class members without compensating them." (SCAC at ¶¶ 230-233.) As stated above, Plaintiffs unjust enrichment allegations are in tension with Plaintiffs' claims that the personal information InMarket allegedly received is "private" and "sensitive" because their unjust enrichment claim implies that they could and would have sold that information to InMarket, as, according to Plaintiffs, InMarket obtained this "private" and "sensitive" information "without compensating them." (*Id.* at ¶ 233). In any event, despite Plaintiffs' contradictory and conclusory allegations under their Seventh claim, Plaintiff's unjust enrichment claim separately and independently fails as a matter of law because unjust enrichment is not a standalone cause of action.

## III. ARGUMENT.

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an

action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, the Court is not required to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Iqbal*, 556 U.S. at 678. Furthermore, "'a plaintiff may plead [them]self out of court'" if they "plead facts which establish that [they] cannot prevail on [their]…claim." *Weisbuch v. Cnty of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir. 1997).

In the Second Amended Complaint, Plaintiffs assert claims for violation of their common law and constitutional rights to privacy, Cal. Penal Code § 502 (CDAFA), Cal. Penal Code § 636.51 (use of a pen register or trap and trace device), Cal. Penal Code § 631 (wiretapping), and Cal. Bus. and Prof. Code § 17200 (unfair and unlawful practices). They also plead a stand-alone claim for unjust enrichment. All of Plaintiffs' claims are predicated on their allegations that they downloaded mobile phone applications *not* developed or owned by InMarket, but which contained an InMarket "software development kit" that caused the applications to transmit their location data to InMarket while Plaintiffs used these third-party applications. Plaintiffs contend that InMarket used this location data to target advertisements to them through and within the third-party applications that provided this data, and that they did not consent to this practice.

Each of Plaintiffs' claims fails as a matter of law for the various reasons explained below.

**A. Plaintiffs' Invasion of Privacy Claim Fails as a Matter of Law.**

Plaintiffs' First Cause of Action for Invasion of Privacy is premised both on a common law theory of privacy rights and the right to privacy found in the California Constitution. (SCAC at ¶¶ 149-160.) California law establishes a "high bar for an invasion of privacy claim." *Belluomni v. Citigroup, Inc.*, No. CV 13-01743 CRB, 2013 WL 3855589, at *6 (N.D. Cal. July 24, 2013). While distinct, these claims are similar. The elements of the common law claim are: "(1) plaintiff had a reasonable expectation of privacy in a certain circumstance, (2) defendant intentionally intruded into that circumstance, (3) defendant's intrusion would be highly offensive to a reasonable person, (4) plaintiff was harmed, and (5) defendant's conduct was a substantial factor in causing plaintiff's harm." *Hurrey-Mayer v. Wells Fargo Home Mortg., Inc.*, No. 09cv1470 DMS (NLS), 2009 WL 3647632, at *3 (S.D. Cal. Nov. 4, 2009) (citation omitted).

The elements of a claim for invasion of privacy under the California Constitution are: "(1) the [plaintiff] possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is 'so serious as to constitute an egregious breach of social norms' such that the breach is 'highly offensive.'" *Davis v. Facebook, Inc. (In re Facebook Inc. Internet Tracking Litig.)*, 956 F.3d 589, 601 (9th Cir. 2020) (quoting *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009)); *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 35–37 (1994).[2] Both of Plaintiffs' theories of liability fail for numerous reasons.

First, Plaintiffs have failed to plausibly allege that they had a reasonable and protectable privacy interest in the geolocation data allegedly obtained by InMarket. Numerous courts have assessed invasion of privacy claims related to geolocation data and have refused to find that such information crosses the "high bar" to establish such a claim. In *In re Google Location History Litig.*, the court expressly declined to extend authorities discussing personal or bodily autonomy to the "data autonomy" framework presented by geolocation information. 428 F. Supp 3d 185, 198 (N.D. Cal. 2019).[3] The court likewise rejected the contention that a "person's general

---

[2] The first prong — "[w]hether a legally recognized privacy interest is present in a given case [—] is a question of law to be decided by the court." *Hill*, 7 Cal. 4th at 40. The second and third prongs are "mixed questions of law and fact." *Id.*

[3] Notably, while the court in a later iteration of that case found that the plaintiffs had a

location" is the "type of core, value, informational privacy" that California authorities had previously recognized as sufficient to plead an invasion of privacy claim. *Id*. at 199. *In re iPhone Application Litig*., is also on point, as the court rejected the argument that collection of "unique device identifier number[s], personal data, and geolocation information," even without "knowledge or consent" was sufficient to establish an invasion of privacy claim. 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012); *see also Esparza v. Kohl's*, No. 23-cv-01988-AJB-KSC, 2024 U.S. Dist. LEXIS 47564, at *21-22 (S.D. Cal. Mar. 18, 2024) (discussing browsing history, IP addresses, and other "personal details"); *Graf v. Zynga Game Network, Inc. (In re Zynga Privacy Litig.),* 750 F.3d 1098 (9th Cir. 2014) (discussing URL information); *D'Angelo v. FCA US, LLC,* No. 3:23-cv-00982-WQH-MMP, 2024 U.S. Dist. LEXIS 70298 (S.D. Cal. Mar. 28, 2024) (discussing website chat communications); *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010 (N.D. Cal. 2012) (discussing URL and social media platform identification information).

Plaintiffs allege that they downloaded third-party applications that "request[ed] access to the location data generated by [their] device's operating system." (SCAC ¶¶ 15, 21, 45.) They thus concede that they knew these applications collected geolocation information (though allege that they did not know such information would be shared). (*Id.* at ¶¶ 15, 21.) And they specifically plead that these applications only sent their geolocation data to InMarket *while* they were using such applications. (*Id.*) Thus, Plaintiffs do not allege that InMarket received information sufficient to track all their movements; they allege that InMarket only received information regarding the location of their devices during limited times when they chose to use these third-party applications, knowing full well that the applications tracked their location. Plaintiffs do not even allege that InMarket knew who they were or that it could link any geolocation information to their names. (*See* SCAC.) Rather, they allege that InMarket received a "unique mobile device identifier." (*Id*. at ¶¶ 46, 50.) Such allegations are insufficient to

---

reasonable and protectable privacy interest in their location data, the factual scenario was far different, as they alleged that the "proliferation of Google-hosted apps allows for a continuous flow of personal data to Google's servers, even when a user is not interacting with those apps" and even when user opted to turn "Location History off." 514 F. Supp. 3d 1147 (N.D. Cal. 2021).

establish the existence of a protectable privacy interest. *See In re Google Location History Litig.*, 428 F. Supp. 3d at 198 (distinguishing comprehensive from limited collection of geolocation information, where the plaintiffs were only tracked while using defendant's systems).

Relatedly, while Plaintiffs allege that InMarket *may* receive information about where a consumer worships, receives medical treatment, etc., they never allege that InMarket obtained any uniquely sensitive geolocation information with respect to their own movements. (*See* SCAC.) Although they allege that they took their mobile phones to such locations, they do not allege that InMarket tracked them there or that they used the applications at issue at those locations (*e.g.*, neither Plaintiff alleges that they used the CVS or Walmart application while at church). And while Plaintiffs may argue that InMarket has "always on" capabilities, their allegations on this issue are vague, conclusory, and contradictory to their express allegations regarding the applications that they downloaded. Plaintiffs surely know if they granted the applications at issue the ability to collect and transmit geolocation data at all times. Their failure to allege that these applications did so speaks volumes. Again, *In re Google Location History Litig.* is directly on point, with the court rejecting similarly vague and undeveloped allegations as "entirely speculative" and insufficient to plead a claim. 428 F. Supp. 3d at 199; *see also Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1091 (N.D. Cal. 2022) (rejecting allegations of collection of sensitive information as conclusory and implausible).

Second, Plaintiffs have failed to plead that InMarket's alleged activities were "highly offensive" or reflected an "egregious" breach of societal norms.[4] "A court determining the existence of 'offensiveness' would consider the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." *Miller v. Nat'l Broad. Co.*, 187 Cal. App. 3d 1463, 1483-84 (1986); *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1233 (C.D. Cal. 2017) ("Courts have been hesitant to extend the tort of invasion of privacy to the routine collection of personally identifiable information as part

[4] Whether an interest is protectable is closely related to whether intrusion upon that interest is highly offensive, such that all of the arguments contained above apply here as well.

of electronic communications…. By contrast, collection of intimate or sensitive personally identifiable information may amount to a highly offensive intrusion.”).

Numerous courts have held that the collection and disclosure of a consumer’s personal information is routine commercial behavior that, absent more, does not rise to the level of “highly offensive” conduct. *See, e.g., In re Google Location History Litig.*, 428 F. Supp. 3d at 198; *In re iPhone Application Litig.*, 844 F. Supp. 2d at 1063; *Low*, 900 F. Supp. 2d at 1025. Looking at Plaintiffs’ allegations here, there is no reason to depart from this established standard. Plaintiffs do not allege ignorance that their mobile devices were transmitting geolocation information. Rather, they concede that they knew such information was being provided, but that they did not know that the applications at issue—which to be clear do not contain the InMarket SDK—would share such information with InMarket for advertising purposes. Nor do they allege that they reviewed the applicable privacy policies of these third parties and were deceived—much less that InMarket had the ability to control such disclosures even if they *had* reviewed them.

Moreover, Plaintiffs’ overarching concern in the Second Amended Complaint is not that InMarket allegedly received geolocation information from their mobile devices, but that InMarket used that information to provide targeted advertisements to them—with such advertisements being displayed *within* the third-party application that provided the geolocation data. (SCAC at ¶¶ 17, 23, 43, 89 (explaining where the advertisements are placed), and 94.) InMarket is unaware of any legal authority supporting the proposition that a desire to not be shown targeted advertisements constitutes a privacy interest, much less that a business’s use of a narrow band of information to provide relevant advertising to a consumer within the confines of an advertising-supported mobile phone application is “highly offensive” conduct that reflects an “egregious” violation of societal norms.[5]

---

[5] Note that even in a decision such as *Davis v. Facebook, Inc. (In re Facebook Inc. Internet Tracking Litig.)*, 956 F.3d 589 (9th Cir. 2020), which allowed an invasion of privacy claim to proceed, the court focused heavily on the breadth and depth of the data collected, along with the defendant’s ability to tie such data to a specific, known individual.

Third, Plaintiffs fail to plead that InMarket acted with the requisite intent. At most, they allege that InMarket "does little to verify" the disclosures made by third-party applications that provide geolocation data to InMarket. (SCAC ¶ 115.) And of course, Plaintiffs make no allegations reflecting the disclosures that were made to them, or even what permissions they granted to the applications identified in the Second Amended Complaint (which do not contain the InMarket SDK).

Accordingly, Plaintiffs' First Cause of Action for invasion of privacy should be dismissed as a matter of law.

**B. Plaintiffs' CDAFA Claim Fails as a Matter of Law.**

The CDAFA makes it unlawful for a person to: (1) "knowingly access[] and without permission [] use[] any data, computer, computer system, or computer network in order to [] wrongfully control or obtain money, property, or data" (Cal. Penal Code § 502(c)(1)); (2) "knowingly access[] and without permission take[], cop[y], or make[] use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network" (Cal. Penal Code § 502(c)(2)); or (3) "knowingly access[] and without permission access[] or cause[] to be accessed any computer, computer system, or computer network" (Cal. Penal Code § 502(c)(7)). *See In re Carrier IQ, Inc., Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1097-98 (N.D. Cal. 2015).

Here, Plaintiffs contend that InMarket violated the CDAFA "by including within the SDK that Defendant provides to developers, software that intercepts and transmits data, communications, and personal information concerning Plaintiffs []." (SCAC ¶ 165.) This claim likewise fails for several independent reasons.

First, to bring a claim under CDAFA, the owner of the data must adequately allege "damage or loss by reason of a violation" of the statute. Cal. Penal Code § 502(e)(1); *see also In re Google Android Consumer Priv. Litig.*, No. 11-MD-02264 JSW, 2013 WL 1283236, at *6 (N.D. Cal. Mar. 26, 2013) ("CDAFA [c]laims require some showing of damage or loss, beyond the mere invasion of statutory rights"). Plaintiffs make no such allegation, and instead focus

expressly on an "unjust enrichment" theory without ever alleging that they have suffered any type of economic loss. (SCAC ¶¶ 170.) Nor could they, as Plaintiffs' allegation that there is a market for them to sell *their* real-time location data is entirely conclusory, and they fail to allege that they had any intention to sell their data—indeed, they quite clearly did not attempt to do so regardless of any action or inaction by InMarket. *See Doe v. Meta Platforms, Inc.*, No. 22-cv-03580-WHO, 2023 WL 5837443, at *9 (N.D. Cal. Sept. 7, 2023) (finding allegations that protected information was diminished in value did not qualify as damage or loss under CDAFA); *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 488 (N.D. Cal. 2021) (finding damage or loss under CDAFA did not include "loss of the right to control [Plaintiffs'] own data, the loss of the value of their data, and the loss of the right to protection of the data"); *Pratt v. Higgins,* No. 22-cv-04228-HSG, 2023 WL 4564551, at *9 (N.D. Cal. July 17, 2023) (finding access to communications, notes, and medical information did not create the type of loss contemplated by the CDAFA's private civil cause of action).

Second, Plaintiffs have failed to plausibly allege that InMarket "knowingly" obtained any geolocation information about them "without permission." As explained above, Plaintiffs have intentionally failed to identify or describe the disclosures made to them when they downloaded the third-party applications on which their claims are based. Worse still, even assuming such disclosures were inadequate, Plaintiffs never allege that InMarket was aware of any deficiencies or had any reason to believe that Plaintiffs were unaware that the applications could share data with third-parties. Fundamentally, Plaintiffs knowingly and intentionally downloaded the applications to their devices and gave those devices access to geolocation information while using the applications. *See In re iPhone Application Litig.*, No. 11-MD-02250-LHK, 2011 WL 4403963, at *12 (N.D. Cal. Sep. 20, 2011) ("Plaintiffs have still failed to allege how Defendants can be liable for accessing Plaintiffs' computers 'without permission.' On Plaintiffs' own allegations, the iOS and third party apps—which contain the alleged 'surreptitious code'—were all installed or updated *voluntarily* by Plaintiffs.") (emphasis in original); *see also Flextronics Int'l, Ltd. v. Parametric Tech. Corp.*, No. 5:13-cv-00034-PSG, 2014 U.S. Dist. LEXIS 73354, at *15 & n.46 (N.D. Cal. May 28, 2014) ("[B]ecause [plaintiff] voluntarily gave permission to

install some portion of [defendant's] software on its computers, any additional code installed at the same time was also installed with permission. This argument has been adopted in many other cases.") (collecting cases).

Accordingly, Plaintiffs' Second Cause of Action for violation of the CDAFA should be dismissed as a matter of law.

**C. Plaintiffs' Cal. Penal Code § 638.51 Claim Fails as a Matter of Law.**

California law prohibits the installation of a pen register without first obtaining a court order. Cal. Penal Code § 638.51. The statute defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." *Id.* § 638.50(b). Here, Plaintiffs contend that InMarket's "SDK" is a "pen register" because it "is a device or process that records addressing or signaling information—Plaintiffs' [] location data and personal information—from the electronic communications transmitted by their smartphones." (SCAC ¶ 178.)

Section 638.51 has been assessed only sporadically in federal courts, and has never been cited in a published California decision. In *Greenley v. Kochava, Inc.*, the court began its analysis by noting as follows:

> Traditionally, law enforcement used "pen registers" in investigations to record all numbers called from a particular telephone, and "pen registers" required physical machines. Today, pen registers take the form of software. As a result, private companies and persons have the ability to hack into a person's telephone and gather the same information as law enforcement.

684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023). Thus, the Court reasoned, "courts should focus less on the form of the data collector and more on the result." *Id.* However, nothing in *Greenley* expands—or attempts to describe or define—the statutory scope of a "pen register" as *only* pertaining to the collection of "dialing, routing, addressing, or signaling information."

In *Greenley*—which of course is not binding and has resulted in an avalanche of litigation purporting to criminalize the basic operations of e-commerce—the plaintiffs alleged that the defendant received *far* more than location data through its SDK. Specifically, they alleged that

the defendant received data reflecting their "spending habits" and purchasing decisions, "usernames," "emails and customer IDs," "search terms," "activities within an app" and other "specific communications" made by the plaintiffs. 684 F. Supp. 3d at 1035. That is, the data the defendant allegedly received reflected communicative actions by the plaintiffs, such as what websites they visited and communicated with.

Here, Plaintiffs allege only that InMarket received data from their mobile devices telling InMarket where the mobile device was located at a specific time. This bears no relation to the historical understanding of a pen register as collecting information about who an individual placed phone calls to (or vice-versa, a trap and trace device reflecting who an individual received calls from), and Plaintiffs ask this court to stretch the meaning of this statute far beyond its breaking point.[6] *See Smith v. Maryland*, 442 U.S. 735, 736 (1979) ("A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released.").[7]

Accordingly, Plaintiffs' Third Cause of Action for violation Cal. Penal Code § 638.51 should be dismissed as a matter of law.

**D. Plaintiffs' Cal. Penal Code § 631 Claim Fails as a Matter of Law.**

Section 631(a) of the California Penal Code consists of three main clauses which cover "three distinct and mutually independent patterns of conduct:" (1) "intentional wiretapping;" (2) "willfully attempting to learn the contents or meaning of a communication in transit over a wire;" and (3) "attempting to use or communicate information obtained as a result of engaging in either of the two previous activities." *Tavernetti v. Superior Court of San Diego Cty.*, 22 Cal. 3d 187, 192 (1978). The fourth basis for liability under Section 631(a) is for aiding and abetting any person or persons who "unlawfully do, or permit, or cause to be done any of the other three bases

---

[6] While a few courts have recently permitted pen register claims to proceed with respect to websites that allegedly transmitted IP addresses and GET requests to third-parties, such information is far more analogous to the traditional realm in which pen registers were used (*i.e.* phone calls). *See Mirmalek v. L.A. Times*, 2024 U.S. Dist. LEXIS 227378 (N.D. Cal. Dec. 12, 2024); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032 (N.D. Cal. Oct. 21, 2024).

[7] Additionally, InMarket's arguments above regarding Plaintiffs' failure to allege facts plausibly suggestive of a lack of consent are directly applicable here as well.

for liability." *Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021).[8]

Here, Plaintiffs appear to bring their Section 631 claim under all three primary clauses. They allege, among other things, that InMarket "intercepts, reads, or attempts to read Plaintiffs' [] data, communications, and personal information in California," "intercepts Plaintiffs' [] communications with they are in transit [],” and "uses the contents of the communications to sell to third parties []." (SCAC ¶¶ 187-189.) Each of these theories fails as a matter of law.

First, the first clause of Section 631(a), for "intentional wiretapping," applies only to "telegraph or telephone" communications over a wire. *See, e.g., In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 825 (N.D. Cal. 2020) ("Beginning the first clause of § 631(a), Defendants are correct that it protects only communications that are made over a 'wire, line, or cable.' This is evident from the plain text of the statute: The first clause expressly requires that the unauthorized 'connection' be made with any telegraph or telephone wire, line, cable, or instrument.") (quoting Cal. Penal Code § 631(a)); *Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 8200619, at *18 (N.D. Cal. Aug. 12, 2016) ("The first clause" of § 631(a) is "limited to communications passing over 'telegraph or telephone' wires, lines, or cables.").

Second, Plaintiffs do not allege that InMarket "learn[ed] the contents or meaning of a communication" that they sent to any other person or entity. Unlike a written or verbal statement—or even a "GET request" by which an individual directs a business's server to display

---

[8] Section 631(a) of the California Penal Code imposes liability on "any person who by means of any machine, instrument, or contrivance, or in any other manner:

- [1] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or
- [2] who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or
- [3] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or
- [4] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section[.]

Cal. Penal Code § 631(a) (numbering and formatting added for reference)

a particular website or URL—Plaintiffs do not allege that they engaged in any communicative act or behavior with respect to the third-party applications underlying their claims. Rather, they allege that the applications were programmed to take location information directly from their mobile devices and send it to InMarket. (SCAC ¶ 46.) As alleged in the Second Amended Complaint, Plaintiffs did nothing, said nothing, and were entirely passive throughout that process.[9] That is, an individual's mobile phone is certainly not an extension of their body such that any act the device automatically performs is attributable to the owner, and indeed, Plaintiffs here allege that they did not know that their mobile phones were sending the data at issue in this case. *See In re iPhone Application Litig.*, 844 F. Supp. 2d at 1061 (finding under the federal Wiretap Act that "'content' is limited to information the user intended to communicate, such as the words spoken in a phone call. [] Here, the allegedly intercepted electronic communications are simply users' geolocation data. This data is generated automatically, rather than through the intent of the user, and therefore does not constitute 'content' susceptible to interception."). Notably, "[t]he analysis for a violation of CIPA is the same as that under the federal Wiretap Act," and thus the definition of "contents" under the federal Wiretap Act applies to CIPA § 631(a) claims. *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) (applying definition of "contents" under the federal Wiretap Act to CIPA § 631(a) claims and finding that text messages are content, but "user names, passwords, and geographic location information are not"); *see also Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1085 (N.D. Cal. 2018) ("Plaintiff's geolocation data is also record information rather than the content of a communication; the data is automatically generated when Plaintiff activates the Lyft App…. While a text message stating 'I am at 6th and Broadway' would constitute content, the automatic generation of geolocation data is record information.") (internal citations omitted).

[9] While paragraph 186 of the Second Amended Complaint states with no detail or supporting factual allegations that InMarket tracks activities such as "clicking a link, installing an app, selecting an option, or relaying a response," these copy-and-paste allegations are conclusory and inconsistent with Plaintiffs' factual allegations that InMarket received location data from the third-party applications. (*See* SCAC ¶¶ 43-47.) Indeed, these allegations appear to relate to Plaintiffs' allegations regarding InMarket's own (first-party) applications, which Plaintiffs do not allege they ever downloaded or interacted with.

Finally, because Plaintiffs have failed to plead a claim under the first or second prong of Section 631(a), their claim under the third prong (*i.e.*, that InMarket used improperly collected information) necessarily fails as well.

Accordingly, Plaintiffs' Fourth Cause of Action for violation Cal. Penal Code § 631 should be dismissed as a matter of law.

**E. Plaintiffs' UCL Claims Fail as a Matter of Law.**

1. Plaintiffs' UCL Claims Fail for Lack of Standing.

In their Fifth Cause of Action, Plaintiffs allege that InMarket violated the unfair prong of the UCL by "surreptitiously collecting, tracking, using and disseminating Plaintiffs' and Class Members' personal information, geolocation data, and communications." (SCAC ¶ 209.) And in their Sixth Cause of Action, Plaintiffs allege that InMarket violated the "unlawful" prong of the UCL vis-à-vis the other causes of action discussed above, and by way of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. (*Id.* at ¶¶ 209, 218.)

Plaintiffs do not allege that they paid for the third-party applications they supposedly downloaded and on which their claims are premised. Thus, there can be no contention that they overpaid for or would not have purchased any goods or services had they known that the applications contained an InMarket SDK or been aware of InMarket's activities. Rather, Plaintiffs allege—generically and with no detail or concrete assertions of fact—that they "were injured and suffered damages, a loss of privacy, and loss of value of their personal information" because of InMarket's alleged conduct. And while Plaintiffs make a conclusory allegation that "there is a market" for location information, they fail to allege that they attempted to sell their location data, that they have *ever* had *any* intention to do so, or that *their* location data (from nearly a year ago) has or could have had any value at present. This is insufficient to establish statutory standing.

The UCL limits standing to those who have "suffered injury in fact and lost money or property as a result of . . . unfair competition." Cal. Bus. & Prof. Code § 17204. Thus, "[t]o satisfy the narrower standing requirements imposed by [§ 17204], a party must [] (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact [] and (2) show that

the economic injury was the result of, i.e., *caused by*, the unfair business practice [] that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) (emphasis in original).

Critically, "no federal court has wedged individual digital data into the UCL's 'money or property' box." *Rodriguez v. Google LLC*, No. 20-cv-04688-RS, 2021 WL 2026726, at *8 (N.D. Cal. May 21, 2021). "The relevant inquiry is not whether Defendant[] can profit from Plaintiff's personal information, but whether Plaintiff himself can profit from his own data." *Greenley,* 684 F. Supp. 3d at 1054. "Courts in this District have held that to proceed on an economic injury theory, data privacy plaintiffs must allege the existence of a market for their data and the impairment of the ability to participate in that market." *Ji v. Naver Corp.*, No. 21-cv-05143-HSG, 2022 WL 4624898, at *9 (N.D. Cal. Sept. 30, 2022) (citing *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1040 (N.D. Cal. 2019) ("It is not enough to merely say the information was taken and therefore it has lost value []. That the information has external value, but no economic value to plaintiff, cannot serve to establish that plaintiff has personally lost money or property.")).

Here, Plaintiffs do not allege any attempt or intention to market or sell their geolocation information, nor do they provide any "specific allegations regarding the value of the information." *Swarts v. Home Depot, Inc.*, No. 23-cv-0995-JST, 2023 U.S. Dist. LEXIS 153477, at *26 (N.D. Cal. Aug. 30, 2023) ("Numerous courts have held that disclosure of personal information alone does not constitute economic or property loss sufficient to establish UCL standing, unless the plaintiff provides specific allegations regarding the value of the information."). Indeed, their allegation that "there is a market" is entirely conclusory.

Accordingly, Plaintiffs have failed to allege plausible factual allegations sufficient to establish statutory standing under the UCL, and the Fifth and Sixth Causes of Action should be dismissed.

2. <u>Plaintiffs Have Failed to Plead Any Actionable Unlawful or Unfair Conduct By InMarket.</u>

The viability of a UCL claim under the "unlawful" prong stands or falls with the underlying claims because a "claim under [the unlawful] prong hinges upon whether a plaintiff

can formulate a claim under the predicate law." *Eidmann v. Walgreen Co.*, 522 F. Supp. 3d 634, 647 (N.D. Cal. 2021) (citing *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1094 (N.D. Cal. 2017)). Here, because Plaintiffs have failed to adequately plead any of their underlying claims, their unlawful-prong UCL claim necessarily fails as well. *See Ingels v. Westwood One Broad. Servs., Inc.*, 129 Cal. App. 4th 1050, 1060 (2005) ("'If the [underlying] claim is dismissed, then there is no 'unlawful' act upon which to base [] the derivative Unfair Competition claim'") (second alteration in original).[10]

Similarly, Plaintiffs' UCL claim under the "unfair" prong "cannot survive [because it] overlap[s] entirely with the business practices addressed in the [other] prongs of the UCL," and "the claims under the other [] prongs of the UCL do not survive." *Hadley*, 243 F. Supp. 3d at 1105 (citations omitted). In other words, because Plaintiffs' allegations that InMarket's actions are unfair mirror their allegations that its actions are unlawful, and Plaintiffs' unlawful claim under the UCL fails, Plaintiffs' unfair claim under the UCL also fails. *Id.*

**F. Plaintiffs' Unjust Enrichment Claim Fails as a Matter of Law.**

The Ninth Circuit and California state courts have consistently held that "in California, there is not a standalone cause of action for 'unjust enrichment[.]'" *Astiana v. Hain Celestial Grp.*, Inc., 783 F.3d 753, 762 (9th Cir. 2015) (citing *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010)); *Baiul-Farina v. Lemire*, 804 F. App'x 533, 537 (9th Cir. 2020) ("'[U]njust enrichment is not a cause of action' under California law") (quoting *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004)); *Jogani v. Super. Court*, 165 Cal. App. 4th 901, 911 (2008) ("As [Plaintiff] concedes, however, unjust enrichment is not a cause of action.").

The Court here should follow "the more widely accepted principle that there is no

---

[10] In the Second Amended Complaint, Plaintiffs also reference Section 5 of the Federal Trade Commission Act. (SCAC ¶ 218.) This law cannot serve as the predicate for a UCL "unlawful" claim. *Quick Dispense, Inc. v. Vitality Foodservice, Inc.*, No. 8:23-cv-02322-FWS-ADS, 2024 WL 2925589, at *13 (C.D. Cal. June 4, 2024) ("Plaintiff cannot allege a UCL claim based on a violation of the [Federal Trade Commission Act]…. The [Federal Trade Commission Act] does not provide individuals with a private right of action and cannot be used as a predicate for a UCL claim…. Therefore, the court concludes that Plaintiff has failed to allege a UCL claim based on a violation of the [Federal Trade Commission Act]."); *see also In re Sequoia Bens.*, No. 22-cv-08217-RFL, 2024 WL 1091195, at *8 (N.D. Cal. Feb. 22, 2024).

separate cause of action for unjust enrichment," *Blue Wing Airlines Fin. v. Unical Aviation, Inc.*, No. 8:22-cv-02052 JVS (ADSx), 2023 WL 3149276, at *2 n.2 (C.D. Cal. Mar. 8, 2023), and dismiss Plaintiffs' Seventh Cause of Action. *See Greenley*, 684 F. Supp. 3d at 1055 (granting motion to dismiss "with respect to Plaintiff's unjust enrichment claim" because "Plaintiff's final cause of action is for 'unjust enrichment,' which is not a standalone cause of action.").

## IV. CONCLUSION.

For the foregoing reasons, InMarket respectfully requests that the Court dismiss the Consolidated Amended Class Action Complaint, and each cause of action asserted therein, in full and without leave to amend.

Dated: January 17, 2025

VENABLE LLP

By: */s/ Jean-Paul P. Cart*
Jean-Paul P. Cart

Attorneys for Defendant,
InMarket Media, LLC